**TRAYLOR ENGINEERING & MFG. CO. v. LEDERER, Collector of Internal Revenue.**

(District Court, E. D. Pennsylvania. June 29, 1920.)

No. 6364.

**Internal revenue ⬥⇒9—Munition manufacturer's tax; net profits.**

Where a corporation munition manufacturer entered into an agreement with two individuals by which, in consideration of their contributing to the expense of an agent sent to England to try to obtain a contract for furnishing munitions to the British government, and aiding by their influence and otherwise, not involving expense, in procuring and carrying out the contract, they were to share in proportion to the amount advanced in the profits made, and under which, the contract having been secured and performed, it paid them from the profits an amount approximately 1,000 times the amount of their contributions, the corporation *held* not entitled to deduct such payments from its gross profits in order to ascertain its net profits, subject to excise tax under Act Sept. 8, 1916, § 301 (Comp. St. § 6336¼b).

⬥⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by the Traylor Engineering & Manufacturing Company against Ephraim Lederer, Collector of Internal Revenue. Trial to court, and judgment for plaintiff for part of demand.

F. B. Bracken, of Philadelphia, Pa., for plaintiff.

Robert J. Sterrett, Asst. U. S. Atty., and Chas. D. McAvoy, U. S. Atty., both of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. In this case there was a waiver of the right of trial by jury, in accordance with the acts of Congress, and there is no controversy over the evidentiary facts. The defendant, as collector of internal revenue, exacted from the plaintiff the payment of a tax, and there is the equivalent of a stipulation with respect to the main question that, if this payment was unlawfully exacted, the plaintiff is entitled to judgment, but otherwise is not.

The legal merits of this main question are best presented by the grouping of three stories, which make up the whole story of the case, together with a sequel, which is thought to present the legal merits of the same story from a somewhat different viewpoint, or another phase of the legal character of the case.

The first story is that one man (whom we will call A.) advanced a sum of money, the exact amount of which we do not know, but which was about, and was assumed to have been, the sum of $666.67. It was advanced to the plaintiff as a contribution toward the expenses of a trip which a representative of the plaintiff was to make to Europe to seek to secure a munition contract with the British government. The conditions under which the advancement was made were a little indefinite in details, but they were in substance that A. was to share in the profits which the contract (if one was secured) ultimately yielded, in the proportion which his advancement bore to the total expenses of the trip. A contract was obtained, and ultimately proved so fairly profitable that A. received as his share the not unhandsome sum of $650,000.

The second story is that a second man (whom we will call B.) made a like contribution of another sum (which was afterwards treated as the sum of $500) under a like expectation of sharing in profits. This expectation was realized in the receipt by him of a like proportionate profit of $487,500.

The third story relates to the part the plaintiff had in the venture. It made and performed the contract, supplying everything required with such success that the venture yielded a total profit of $1,750,000, which it retained for itself after paying thereout the above shares. The original obligation assumed by the contributors does not seem to have extended beyond the risking of the respective contributions made. The contract brought back, however, was a large and important one, and gave promise of being profitable. It involved, among other things, the payment to the plaintiff of the sum of $1,000,000 as in effect, an advance payment for the shells to be manufactured, to enable the plaintiff to equip its plant for the production of the shells.

A bond was required of the plaintiff, with surety, to assure the British government against loss in making this advance payment. A.

and B., having gone into the venture, were, of course, interested in its success, and did what they could to promote it. This took the form (and the assistance rendered was without doubt real and substantial) of letters of introduction to persons in London, whose assurances of the ability of the plaintiff to perform and its responsible character were accepted by the British Secretary of State for War.

The securing of a surety on the bond required that the surety company should be indemnified, and A. and B. (each a man of large means) became the indemnifiers. It was of very practical advantage to have proving grounds in this country, at which the shells could be tested, and A., whose relations with the Bethlehem Steel Company were friendly, interceded and obtained for the plaintiff the use of the Bethlehem Company's ballistic equipment.

When the agreement, as originally made, came to be put in writing, the draftsman was a little put to it to expand the consideration flowing from A. and B., and to this end recited what they had already done, and added a very sweeping, but indefinite, undertaking that they were to do what they could to further the success of the venture. In fact, however, they were not called upon to do anything beyond what has been stated. The use of the proving grounds was a privilege which the plaintiff valued, and its president has put of record the expression of his opinion that it could not have been secured without the assistance of A. It may be, however, that convenient proving grounds could have been secured for something less than the over $1,100,000 paid A. and B.

Congress, by the Act of September 8, 1916, imposed (inter alia) an excise tax upon manufacturers of munitions, measured in amount by 12.5 per cent. of the profits made on munition contracts. The motive and purpose of the law was to reach so-called war profits. The main question raised and discussed is whether the $1,137,500 received by A. and B. enters into the measurement of the tax liability which plaintiff does not otherwise dispute. None, of course, would have the hardihood to deny either that the $1,137,500 was profit, or a profit, made by a manufacturer of munitions, and the plaintiff cannot deny this, because the obligation, which it recognized, to pay A. or B. anything, was dependent upon this fact.

The first and main point made by counsel for plaintiff, in his characteristically clear-cut argument, is not based upon a denial that the money paid A. and B. was part of the profits made on the contract, but upon the denial that this part of the profit was made by the plaintiff. It is confidently asserted, on the contrary, that the payment made to A. and B. was an expense to the plaintiff, the obligation to pay which had been (whether in the exercise of good judgment or not) in good faith incurred, and plaintiff could no more escape the payment, or be made answerable for it as a profit, than in the case of wages and bonus paid to its employés.

Just here it is to be observed that the question is not whether the payment to A. and B. was to them as creditors or distributees of a dividend from earnings, but the narrower question of whether the sums paid them are within the deductions which may be made from gross receipts, in order to determine the profits as defined by Con-

gress. Plaintiff's contention is that the deductions allowed by Congress in any fair view include all compulsory payments, whether strictly within the phrases of "running expenses," "management," or any one of the several expressions used to define the allowed deductions or not.

The same thought, differently expressed, is that it was the intent of Congress that the taxpayer should contribute only out of what he made and retained for himself, and not out of what he was obliged to pay out to others, before what were to him profits appeared. As a general abstract proposition this must be accepted. It still remains, however, the province of Congress to determine the mode by which excise taxes are to be measured, and if by profits, to define that term. There is a very practical necessity for doing this, because otherwise distribution of profits could easily be made to assume the guise of the payment of a debt.

Without any thought of escaping the payment of taxes, but to bring about what is believed to be a more just distribution of profits, it is not unusual to pay dividends, in the form of salaries, to executive officers of corporations. The illustration of wage bonus used in presenting the argument of counsel for plaintiff is one for which he is not responsible. Whether in strict principle even this, if measured by and dependent upon profits, is within the deductions allowed by the act of Congress, the distinction between an ordinary wage bonus and the case of what is really a division of profits is that the one bears a normal relation to the value of the service rendered; the purpose of the payment of the bonus being to stimulate the wage-earner to add to the productiveness of his labor, but the other has no such normal relation.

Without prolonging the discussion by going into all the refinements of the argument, we rest the ruling now made upon the broad proposition (concretely stated with respect to the facts of this case) that it is not the meaning of the act of Congress that a corporation may pay out of its profits to those interested with it in a common venture $1,000 for every dollar such persons have put into the venture, nor that it may pay them $1,000,000 as a premium for going on a surety bond for that sum, and thereby reduce the measure of the excise tax which the corporation would otherwise have been called upon to pay. The reason is that obviously such payments are not made as compensation for moneys advanced or services rendered, but are made by way of distribution of profits among the joint ventures, and what is more to the point the act of Congress does not permit deductions to be made for such payments before finding what are the profits made within the meaning of the taxing law.

This brings us to the sequel to the stories already told, which is, as told by the plaintiff, that the profits made, and because of which this tax was levied, were made, not by the plaintiff, but by A. and B., and that there is no more justification for demanding payment of their taxes from the plaintiff than there would be to demand of them payment of the tax assessed against the plaintiff. This view, and the further position that the act of Congress is not retroactive with respect

to the person taxed, is taken because the exaction of the tax is sought to be justified on the theory that the profits made were made by the "partnership" or "association" made up of the plaintiff, A., and B., and that the act of Congress authorizes the enforcement of the collection of the tax from the plaintiff; the partnership, or association, having ceased to exist.

The argument denying the act to be retroactive as affecting the taxpayer is summed up in the statement that, although the taxable year is made to begin on January 1 before the enactment of the law, the taxpayer subjected to the payment of the tax is one engaged in the manufacture of munitions at the time of the passage of the act. The view we have taken makes it unnecessary to go into this phase of the case. This contract belonged to the plaintiff, and was performed by it. The plaintiff was a munition manufacturer, taxable as such. The profits made were its profits, and received by it. The ruling is based upon the answer to the question of what were the profits which measure the tax. Is it the amount of profits as reduced by the payments to A. and B., or before such payments? The answer is, before the payments.

This conclusion calls for a judgment in favor of defendant. There was, however, payment of a further tax exacted, into which there is no need to go, because the defendant concedes that plaintiff is entitled to judgment for this.

Plaintiff may enter judgment for this sum, with costs, and the judgment so entered is incorporated herewith, to bear date, however, from the date of entry. If the parties cannot agree upon the amount, we retain jurisdiction of the case for the purpose of making the finding.